UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ROSETTA KIRKLAND,

        Plaintiff,

    -against-

NEW YORK CITY TRANSIT AUTHORITY,
MTA/NEW YORK CITY TRANSIT
AUTHORITY, and SARAH LIBRERA,

        Defendants.
-------------------------------------------------------------X
JUANA GUTIERREZ,

        Plaintiff,

    -against-

METROPOLITAN TRANSIT AUTHORITY/
NEW YORK CITY TRANSIT AUTHORITY
and SALLY LIBRERA,

        Defendants.
-------------------------------------------------------------X
SOOSSAN SALMASSI,

        Plaintiff,

    -against-

METROPOLITAN TRANSIT AUTHORITY/
NEW YORK CITY TRANSIT AUTHORITY
and SIDNEY GELLINEAU,

        Defendants.
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 3, 2015

12-cv-2102 (PAC)

12-cv-2760 (PAC)

11-cv-4038 (PAC)

```
------------------------------------------------------------X
```
CHARLES THIGPEN,

           : 

        Plaintiff,

           : 

    -against-

           :    12-cv-2103 (PAC)

NEW YORK CITY TRANSIT AUTHORITY
and SIDNEY GELLINEAU,    :

          Defendants.  :
```
------------------------------------------------------------X
```
MARIA MARTINEZ, as Executor of the Estate :
of Oscar Martinez,

           :

        Plaintiff,

           :

    -against-

           :    12-cv-2665 (PAC)

NEW YORK CITY TRANSIT AUTHORITY
and SIDNEY GELLINEAU,    :

          Defendants.  :
```
------------------------------------------------------------X
```
DEBORAH ENGLISH,

           :

        Plaintiff,

           :

    -against-

           :    12-cv-2667 (PAC)

METROPOLITAN TRANSIT AUTHORITY/
NEW YORK CITY TRANSIT AUTHORITY :
and MALLICK SOHAIB,    **OPINION & ORDER**

           :

          Defendants.
```
------------------------------------------------------------X
```

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiffs Rosetta Kirkland, Juana Gutierrez, Soossan Salmassi, Charles Thigpen, Maria Martinez[1], and Deborah English had their employment terminated as part of a reduction in force ("RIF") at Defendants New York City Transit Authority ("NYCTA") and Metropolitan Transit

[1] Maria Martinez is the named Plaintiff as executor of the estate of Oscar Martinez.

Authority/New York City Transit Authority.  They allege that the two Authorities, together with Sally Librera,[2] Sidney Gellineau, and Sohaib Mallick[3], discriminated against them on the basis of their age, in violation of the Age Discrimination in Employment Act ("ADEA"), New York State Human Rights Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL").[4] Defendants move for summary judgment.

Defendants' Motions for Summary Judgment are GRANTED.  Plaintiffs have failed to provide evidence from which a reasonable jury could conclude that Plaintiffs' ages were a "but-for" cause of their employment termination.

## **BACKGROUND**

Plaintiffs Kirkland, Gutierrez, Martinez, and English are former employees of the Manhattan and Bronx Surface Transit Operating Authority ("MaBSTOA"), a statutory subsidiary of the NYCTA.  Plaintiff Salmassi is a former employee of the NYCTA.[5]  Kirkland and Gutierrez were employed in the secretary/occupational unit, while Martinez, Thigpen, English, and Salmassi were employed in three different units of the Division of Technology Information Services ("TIS").

---

[2] Defendant Sally Librera is incorrectly identified in Plaintiff Kirkland's Complaint as "Sarah" Librera.  *See* Kirkland Compl. ¶ 12.

[3] Sohaib Mallick is incorrectly identified in Plaintiff English's Complaint as "Mallick Sohaib."  *See* English Compl. ¶ 13.

[4] In their Complaints, Plaintiffs also asserted claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, as well as additional NYSHRL and NYCHRL claims. Thigpen asserted race discrimination claims, Martinez asserted national origin discrimination and hostile work environment claims, and all Plaintiffs asserted retaliation claims.  In their Opposition to Defendants' Motions for Summary Judgment, however, Plaintiffs withdrew all claims except for their age-based ADEA, NYSHRL, and NYCHRL claims.  "These are age discrimination cases."  Opp. Mtn. 1 n.1.

[5] Defendants assert that Kirkland, Gutierrez, Martinez, Thigpen, and English have improperly sued the NYCTA, because the MaBSTOA is a separate legal entity from the NYCTA.  Defendants have agreed to substitute MaBSTOA as a defendant for those Plaintiffs.  Mtn. at 1 n.1.  Plaintiffs, on the other hand, assert that their "work was not just for Surface Transit . . . but was also for subways," and state that "[t]he termination of [P]laintiff[s] was based on decisions made by, and under the operating budget of" the NYCTA.  *See, e.g.*, Def. Stmt. (English) ¶ 2. Plaintiffs "agree to add the [MaBSTOA], in addition to the [NYCTA], as a defendant."  *Id.*

## I.      Budget Crisis and Reduction in Force

In 2008, the NYCTA faced a severe budget crisis, which worsened over the next two years.  Def. Stmt. (English) ¶ 22[6].  The budget deficit in 2009 was approximately $350 million, and it was projected to grow to $890 million by spring 2010.[7]  *Id.*  In response to the budget crisis, the NYCTA implemented a budget reduction plan.  A hiring and promotional freeze was instituted in April 2008 for all non-operating positions, and was extended in 2009 to include all operating positions.  *Id.* ¶ 25.  Subsequently, on February 23, 2010, NYCTA President Thomas Prendergast announced that the NYCTA would reduce its administrative staff by 15%, specifically targeting managerial, professional, and clerical staff.  *Id.* at ¶ 26.  To help meet the 15% reduction target, in March 2010, the NYCTA authorized a voluntary severance program for administrative employees.  *Id.* ¶ 33.  While 167 employees resigned or retired voluntarily, this was not sufficient to meet the 15% reduction target.  *Id.*

In May 2010, the NYCTA Office of Management and Budget ("OMB") conducted an analysis of administrative staffing levels, and "identified the number of excess employees by title group within each department that would be subject to layoffs."  *Id.* ¶ 34.   OMB then informed the NYCTA and MaBSTOA of the number of employees in each department that would need to be laid off via a non-voluntary RIF.  *Id.* ¶¶ 34, 36.

### a.  Clerical/Administrative Occupational Reductions

Pamela Noonan-Coppola, the Department of Subways ("Subways") liaison to Human Resources, directed the RIF evaluation process for Subways.  Def. Stmt. (Kirkland) ¶ 82.  There

---

[6] References to Defendants' Rule 56.1 Statements in Support of their Motions for Summary Judgment appear as "Def. Stmt. ([Plaintiff]) ¶ __."  Plaintiffs' responses to Defendants' Rule 56.1 Statements are cited as "[Plaintiff] Resp. ¶ __."
[7] Defendants assert that the budget deficit was caused in large part by the economic recession of 2008 and 2009, because the NYCTA derives part of its operating budget from taxes imposed on property transfers, and the sale of property declined dramatically in those years.  *Id.* ¶ 20.

were 22 provisional and at-will employees in the Subways clerical/administrative occupational group.  *Id.* ¶ 87.  In May and June 2010, Noonan-Coppola distributed to the supervisors of those 22 employees an instruction booklet prepared by human resources and modified by Noonan-Coppola for use by Subways.  *Id.* ¶¶ 88, 91.  The booklet contained guidelines concerning how to evaluate clerical/administrative employees.  *Id.* ¶ 88.  The guidelines included twelve categories: "Education," "Work-Related TA/OA[8] Experience and External Experience," "Output Quality," "Output Quantity," "Computer Skills," "Job Knowledge," "Supervisory Skills," "Communications Skills," "Analytical Skills," "Initiative," "Organizational Skills," and "Interpersonal Skills."  *Id.*, Ex. I.  Supervisors were instructed to evaluate each employee on a scale from 1 to 8 for each category on an evaluation form provided by Noonan-Coppola.  The guidelines provided a short description of what each number from 1 to 8 represented when applied to each category.  *Id.*

The evaluation forms contained a numerical multiplier for each category, so that different categories were weighted differently.  For example, the "TA/OA Experience and External Experience" category was multiplied by 6, while the "Computer Skills" category was multiplied by 8.5.  *Id.*, Ex. J.  The weighted scores for each category were then added to arrive at a total score.  At the time the supervisors performed the rankings, they did not know whether—or how many—employees would be laid off.  *Id.* ¶ 94.

### i.  Kirkland

Rosetta Kirkland began working at the NYCTA as a college aide in 1989, and worked in the clerical/administrative group of the MaBSTOA from 1992 until she was laid off on

---

[8] "TA/OA" stands for "Transit Authority/Operating Authority."

September 17, 2010.  Def. Stmt. (Kirkland) ¶¶ 7-8.  From 2008 to 2010, Kirkland worked as a clerical employee in the Office of Workforce Development.  Compl. ¶¶ 13-14.

### ii.  Gutierrez

In 1981, Juana Gutierrez began working as an office clerk for the NYCTA, and in 1993 began employment as a confidential secretary in the clerical/administrative group of the MaBSTOA.  Def. Stmt. (Kirkland) [9] ¶¶ 15-16.  Between 1996 and 2010, Gutierrez's supervisor was Walter Ruiter.  *Id.* ¶ 21.  Ruiter signed Gutierrez's time sheets and prepared her evaluations. *Id.* ¶ 22.

Gutierrez states that she would not have been terminated in the RIF process, had she received a promotion that she had been promised.  According to Gutierrez, her promotion had been approved in November 2009 by Mark Hellman, and in December 2009 by human resources.  Gutierrez Decl. ¶¶ 37-38.  Gutierrez asserts that she was assured that, notwithstanding the hiring freeze, her promotion would go forward.  *Id.* ¶ 41.  Acting Assistant Vice President Sally Librera and Vice President of Operations Support William Cronin, however, "stopped the process and prevented [her] promotion from becoming effective, ensuring that [she] should be left vulnerable to the RIF."  *Id.* ¶ 39.

Gutierrez also asserts that she had worked with Thomas Prendergast at the NYCTA in 1985, and when Prendergast returned as President of NYCTA in 2009, he said to her, "Boy, it is amazing all the same faces I left behind."  Def. Stmt. (Kirkland) ¶ 151.  In addition, Gutierrez testified that, during a NYCTA meeting, Prendergast stated that he was "surprised to see so many old faces."  *Id.* ¶ 152.

---

[9] Defendants have combined the Rule 56.1 Statements for Plaintiffs Kirkland and Gutierrez into one document, which the Court refers to as "Def. Stmt. (Kirkland)".

Gutierrez also claims that in 2010, during a conversation with her colleague Karen Jeffries, Jeffries stated that the NYCTA "want[s] to get rid of older employees. 'Deadwood.'" *Id.*, Ex. V., at 63.

### iii.   Clerical/Administrative RIF Process

Kirkland's RIF evaluation was prepared by Mark Hellman.  *Id.* ¶ 96.  Kirkland testified that she believed that Hellman's evaluation of her was "accurate," that he had "evaluated [her] fairly," and that she did not believe her age had influenced Hellman's evaluation.  *Id.* ¶ 110.

Gutierrez was originally evaluated by Ruiter.  *Id.* ¶ 96.  During the ranking process, however, Librera was informed that Ruiter and Gutierrez had a landlord-tenant relationship.  *Id.* ¶ 120.  Gutierrez was therefore instructed to report to Julio Vidal, rather than to Ruiter.[10]  *Id.* ¶ 121.  Following this transfer, Vidal prepared a new RIF evaluation for Gutierrez, in which she scored three points higher than she had scored on Ruiter's evaluation.  *Id.* ¶ 127.  Gutierrez stated that she believed Librera discriminated against her during the RIF process because Librera was "the head of the department" and "made the decisions."  *Id.* ¶ 154.

Twenty-two clerical employees in Kirkland and Gutierrez's group were ranked; the twelve with the lowest scores were slated for layoffs.  *Id.* ¶ 102.  Kirkland was ranked thirteenth out of twenty-two, and Gutierrez was ranked fifteenth.  *Id.*  At the time of the rankings, Kirkland was 40 years old and Gutierrez was 49.  Of the twelve employees who were laid off, seven were younger than Gutierrez (ages 28, 30, 34, 37, 40, 40, and 45), five were younger than Kirkland, and one was the same age as Kirkland.  *Id.* ¶ 105.  Ten employees were not laid off; six of those

---

[10] The Special Investigations and Review committee subsequently conducted an investigation into whether Ruiter's and Gutierrez's landlord-tenant relationship violated the NYCTA Code of Ethics.  During the investigation, Gutierrez admitted that Ruiter was her tenant, but did not reveal that she and Ruiter had actually married on March 23, 2010.  *Id.* ¶¶ 118, 122-24.

employees were older than Kirkland (60, 58, 55, 55, 45, and 41), and four were older than Gutierrez.  The average age before and after the terminations remained the same.  *Id.* ¶ 106.

Kirkland and Gutierrez were both notified of their terminations on July 16, 2010.  *Id.* ¶ 4. Neither accepts that the RIF process was neutral and objective.  Instead, Kirkland asserts that in June or July 2010, she had a conversation with her NYCTA colleague Laura Turso.  Turso told Kirkland that Librera had attended a meeting with Cronin and Senior Vice President Carmen Bianco, where they had discussed the need for "'young blood' to 'start a program.'"  Def. Stmt. (Kirkland) Ex. S, at 104-06.  Kirkland did not know what the "new program" was, or whether it was ever implemented.  *Id.*, Ex. 5, at 108.  At her deposition, Librera testified that Turso was likely referring to a meeting at which Bianco, Cronin, Turso, and Librera discussed strategies to improve internal communication with employees, including "interactive" communication "that would be closer to social media."  *Id.* ¶ 137.

Kirkland testified that after she was terminated, her job responsibilities were transferred to Turso and Mike Newell, another employee in her unit.  *Id.* ¶ 140.

Gutierrez testified that in August 2010, a month after she was told she was being terminated, she overheard a telephone conversation between Mark Hellman and Arthur Basley, Senior Director of Occupational Safety and Training.  Gutierrez Decl. ¶ 58.  During that conversation, Hellman told Basley, "Make sure you hire the young lady between the age of 25 and 30 that smile, a lot of long black hair, the one[] from the temporary agency.  Def. Stmt. (Kirkland), Ex. U, at 71.

### b.  TIS Reductions

Abigail Amsterdam, TIS's Chief Officer of Finance and Administration, learned of the RIF in 2009.  Amsterdam and Sidney Gellineau, Vice President of TIS, in conjunction with the

human resources department, developed a system to evaluate TIS employees for the RIF.  *Id.* ¶¶ 42-45.  They created twelve categories that were targeted towards the skills and attributes that were considered important to TIS.  *Id*. ¶ 47.  The categories were: "TA/OA Years of Service," "Absenteeism," "Availability," "Quality of Output," "Quantity of Output," "Job Knowledge," "Supervisory Skills," "Communications Skills," "Analytical Skills," "Initiative," "Organizational Skills," and "Interpersonal Skills."  English Resp., Ex. 30.  The lowest score for each category was 1, and the highest was 5.  Like the guidelines for the clerical/administrative group, the TIS system also included numerical multipliers that weighted each category differently.  For example, the score for "Years of Service" was multiplied by 4, while "Output Quality" was multiplied by 12.  Def. Stmt. (English), Ex. I.  The ranking system also included a short definition of scores 1 through 5 for each category.  English Resp., Ex. 30.  At the time Amsterdam and Gellineau developed the evaluation system, they did not know how many positions would be targeted for reduction.  *Id.* ¶ 46.

Senior TIS managers were instructed to evaluate their employees according to the system.  *Id.* ¶ 47.  OMB subsequently informed TIS of the required reductions, and the supervisors' evaluations were used to determine which employees would be laid off.[11]  *Id.* ¶ 48.

### i.  Soossan Salmassi

Soossan Salmassi began working at the MaBSTOA in 1989 as a Provisional Administrative Management Auditor.  She received a promotion in 1995, and in 2004 was transferred to TIS.  In 2005, she became the Director of Contract Compliance in the TIS

---

[11] TIS faced a larger number of reductions than other departments.  In 2009, NYCTA had begun to in-source desktop support services that had been provided by Unisys, a third-party contractor.  The 2009 TIS budget therefore provided for a number of new positions to take over the services previously provided by Unisys.  *Id.* ¶ 31.  In late 2009, however, due in part to the worsening of NYCTA's budgetary problems, the NYCTA decided not to in-source the Unisys contract after all.  Because TIS had already filled some of the new positions created in anticipation of the in-sourcing, additional cutbacks were needed to meet the reductions required by OMB.  *Id.* ¶ 32.

Operations Services Unit, where she reported to Sherry Sugar.[12]   Def. Stmt. (Salmassi) ¶ 16.

Salmassi's primary responsibility was reviewing vendor invoices and services provided under

NYCTA's contracts with Unisys.  *Id.* ¶¶ 17-18.  The Unisys contract was transferred to the

Customer Service & Security Unit in 2009, as part of the NYCTA's planned in-sourcing of

technology services.  *Id.* ¶ 20.  In early 2010, Salmassi was therefore transferred to the Customer

Service & Security unit, where she reported to Richard Hayes and Eustace Castellaneta.  *Id.* ¶ 22.

Salmassi maintains, however, that she remained "under Sugar's authority" until June 2010.

Salmassi Resp. ¶ 20.

      Salmassi also has a different explanation of her termination.  She testified that, beginning

in early 2010, Gellineau and Castellaneta began praising TIS's youngest member for "embracing

new ideas" and being "open to change," and that, during meetings, they said that NYCTA

needed to get rid of "dead wood."  Def. Stmt. (Salmassi) ¶ 54.

      Salmassi also asserts that in February 2010, Sugar asked her to create a complex

spreadsheet relating to the IBM contract, even though Salmassi was familiar only with the

Unisys contract.  *Id.* ¶ 56.  Salmassi suggested that Sugar assign the task to another employee,

who Salmassi believed was more familiar with the IBM contract, but Sugar insisted that

Salmassi perform the task.  *Id.* ¶ 59.  Salmassi claims that, following her completion of the

spreadsheet, she was not invited to key meetings relating to the IBM contract.  *Id.* ¶ 60.

---

[12] Salmassi claims in her Declaration, submitted in conjunction with her Opposition to Defendants' Motion for Summary Judgment, that when she moved to TIS, Sidney Gellineau assigned Dede Ngonga, 48-year-old woman, the position of Senior Director of System Review and Internal Controls, instead of Salmassi.  According to the Declaration, Gellineau said that he "preferred the younger woman for this position," and told Salmassi to look for a different position.  *Id*. ¶ 13.  The Declaration states that, after Salmassi contacted human resources to complain, she was transferred to a different division.  *Id*. ¶ 15.  Salmassi made no mention of these allegations in her Complaint or her deposition.  Accordingly, the Court declines to consider them.  *See Alali v. DeBara*, 2008 U.S. Dist. LEXIS 86760, at *11, at n.6 (S.D.N.Y. Oct. 24, 2008).

In Salmassi's performance reviews, Sugar recommended that Salmassi take certain Excel and other technical courses that were offered by NYCTA, in order to improve her technological expertise. *Id.* ¶ 62. Salmassi stated at her deposition that she had taken the courses, but never informed Sugar that she had done so. *Id.* ¶ 63. Salmassi also claims that, beginning in 2010, NYCTA refused to pay the annual fees for her auditor certification. *Id.* ¶ 66.

Salmassi's RIF evaluation was performed by Sugar, who had supervised Salmassi for several years. The ranking was reviewed by Hayes and Castellaneta. *Id.* ¶ 52. Eighteen managers in Salmassi's unit were ranked, and two were laid off. At the time of the ranking, Salmassi was 59 years old, and the oldest of the eighteen managers. *Id.* ¶ 75. Salmassi was ranked last; the second-lowest ranked manager was 50 years old. Of the sixteen managers who were not terminated, seven were over the age of 50 (ages 58, 57, 55, 52, 52, and 51). *Id.*

On July 16, 2010, Salmassi was terminated, effective September 17, 2010. Salmassi asserts that she was asked to train Christine Hofmann, a 30-year-old woman, to do her job, and that Hofmann then took over Salmassi's job responsibilities. *Id.* ¶ 71. Salmassi does not dispute, however, that at the time of the RIF, Hoffman had accepted a position in another TIS unit. *Id.* ¶ 73.

On August 28, 2010, Salmassi wrote a letter to Joel Andrews, Chief Officer of the NYCTA's Office of Equal Employment Opportunity, seeking an investigation into "rampant cronyism and nepotism" within the NYCTA. *Id.* ¶ 68. The letter made no reference to age discrimination, but asserted that certain employees had been singled out for preferential treatment. *Id.* ¶ 69. Three of the employees that Salmassi identified were over the age of 50 at the time (ages 57, 55, and 51). *Id.*

### ii.  Charles Thigpen

Thigpen began working in the Law Department of the NYCTA in 1991.  He joined the MaBSTOA's Department of Buses in 1993.  Between 1991 and 2001, Thigpen transferred between various units in the MaBSTOA, receiving two promotions.  Def. Stmt. (Thigpen) ¶¶ 7-11.  In 2001, Thigpen began working in TIS, and in 2005 began reporting to Sherry Sugar and Ron Kateman.  In 2006, Kateman requested that Thigpen be promoted, and Sugar approved the promotion.  In 2008, Thigpen was transferred to the Computer Service & Security Unit, where he reported to Eustace Castellaneta and Pam Daley.  His responsibilities included overseeing the ordering and installation of computer-related equipment, as well as the removal and disposal of such equipment.  Def. Stmt. (Thigpen) ¶ 15.

Thigpen claims that in 2008, Kateman recommended him for another promotion, but Sugar "threw away" the recommendation, telling Thigpen that Kateman "didn't do [her] any favors."  *Id.*, Ex. D, at 67.  Thigpen testified that he believed Sugar's action was motivated by age discrimination because, at the time, another employee was also scheduled to receive a promotion, but did not receive one.  *Id.*  Thigpen could not recall the name of that employee, but stated that the employee "retired before the RIF."  *Id.*

Thigpen asserts that at several meetings in 2008 and 2009, Gellineau discussed need to get rid of "dead wood" in NYCTA.  *Id.*, Ex. D, at 37.  According to Thigpen, during this time, Gellineau also stated that he believed that Christine Hoffman, who had recently joined Thigpen's unit, would bring "new life or new blood to the process."  *Id.*, Ex. D, at 72.  In addition, Thigpen stated that in early 2010, Gellineau and Castellaneta began praising Peter Giang, a young TIS employee.  Def. Stmt. (Thigpen) ¶ 49.

Thigpen was ranked by Castellaneta and his senior managers.  *Id.* ¶ 44.  Thigpen asserts

that this was improper, because Castellaneta was "not [his] immediate manager" and was

"unfamiliar with [his] performance."  Thigpen Resp. ¶ 44.  Thigpen was ranked with fifty-four

other employees; nineteen of the fifty-five were slated for layoffs.  Def. Stmt. (Thigpen) ¶ 52.

Thigpen (age 60) was ranked fifth-lowest.  The four lowest-ranked employees were all younger

than Thigpen (ages 30, 35, 42, and 45).  *Id.* ¶ 54.  Of the employees who were not terminated,

four were Thigpen's age or older (ages 63, 61, 60, and 60).

Thigpen was terminated on September 17, 2010.[13]  Def. Stmt. (Thigpen) ¶ 3.

### iii.  Oscar Martinez

Oscar Martinez began working as a computer associate in the MaBSTOA in 1997.  Def.

Stmt. (Martinez) ¶ 7.  During the thirteen years he worked at MaBSTOA, Martinez received

multiple promotions, and was transferred into several different units.  From 2009 until 2010,

Martinez was employed in the Customer Service & Security Unit of TIS.  *Id.* ¶¶ 13-14.

Martinez's duties included analyzing, inventorying, and managing computer database servers.

Def. Ex. D, at 25.

Martinez asserts that in 2007, he was required to train a younger employee, Stanley

Bryan, who eventually took over Martinez's job.  *Id.* ¶¶ 49-50.  Martinez claims that Gellineau

discussed the need to get rid of "dead wood" in the MaBSTOA.  *Id.* ¶ 46.  At his deposition,

Martinez testified that, when Gellineau used the phrase "dead wood," Martinez "thought he was

referring . . . not to old people, but to people who would be sleeping at work, people who would

be reading only newspapers, people who . . . just wanted to be there just to collect money."  *Id.*,

Ex. D, at 60.  Martinez also testified that Gellineau praised Peter Giang, and said, "I want more

---

[13] Thigpen does not dispute Defendants' assertion that he was terminated on September 17, 2010.  Thigpen Resp. ¶ 3.  Thigpen's Declaration, however, states that his termination was effective on July 16, 2010.  Thigpen Decl. ¶ 119.

people like this.  I want young blood." *Id.*, Ex. D., at 92-93.  Martinez testified that, when

Gellineau referred to "young blood," Martinez "thought that he meant full of energy." *Id.*, Ex.

D, at 93.

Martinez's supervisor, David Sepulveda, prepared Martinez's RIF evaluation, and his

other supervisor, Eustace Castellaneta, reviewed it.  *Id.* ¶ 43.  Fifty-five employees in Martinez's

sub-unit were ranked, and the nineteen lowest-ranked employees were selected for layoffs.  *Id.* ¶

51.  Martinez (age 49) was the ninth-lowest ranked employee.  Of the eight employees ranked

lower than Martinez, all but one were younger than 49 (ages 33, 37, 38, 42, 45, 47, and 48).

Thirty-six employees in the unit were not terminated; eleven of those thirty-six were older than

Martinez (ages 63, 61, 60, 60, 59, 59, 56, 55, 52, 51, and 50).  *Id.* ¶ 52.

Martinez was laid off on July 16, 2010, effective September 17, 2010.

### iv.  Deborah English

Deborah English began working at MaBSTOA in 1994 as a computer specialist in the

TIS division.  Def. Stmt. (English) ¶ 6.  From 1994 to 2008, English received "superior" and

"good" performance reviews; she also received two promotions.  *Id.* ¶ 8; English Resp. ¶¶ 7-8.

In 2008, English was assigned to the Internet Technologies Unit, where she reported to Shahreen

Ali and Sohaib Mallick.  Defendants assert that the project that English had been working on was

transferred to Mallick's unit in 2008 because it "had been seriously delayed and needed to be

expedited."  Def. Stmt. (English) ¶ 12.  English contends that any delays in the project were

attributable to Mallick and to Ali, a less qualified thirty-six year old woman, who Salmassi

believes replaced her on the project.  English Resp. ¶ 12.

According to Robert Otero, Chief Officer of Applications in the TIS division, English

was a "very well-regarded member of the unit," but lacked "web-design experience" necessary

for certain tasks.  Def. Stmt. (English), Ex. F.  Mallick testified that he "always liked" English, but that she "was not proficient with [the] technology that [Mallick's group was] using."  *Id.*, Ex. E, at 26, 33.  English claims that Mallick "did not read or chose to ignore English's [performance reviews] and . . . resume," which indicated that she possessed the necessary technical training. English Resp. ¶ 16.  She asserts that she "only needed to learn Mallick's unit's methodology, standards, and screen style," but she never received that training.  English Resp. ¶ 16; *Id.* ¶ 51. Mallick acknowledged that English had not received additional technology training, but explained that, because English's project had been "so much delayed," he "had to use people who were very proficient in this type of technology to finish the job."  Def. Stmt. (English), Ex. E at 33.  In 2008 and 2009, English received "fully satisfactory" evaluations during her performance reviews.  *Id.* ¶ 11.

Mallick prepared English's RIF evaluation, and Otero reviewed it.  *Id.* ¶ 49.  At the time, English was 56 years old.  Sixteen employees in English's unit were evaluated, and the two lowest-ranked employees were laid off: English, and another employee, who was 46 years old. *Id.* ¶ 64.  English's unit contained six employees who were over the age of fifty; English was the only one of those employees who was laid off.  *Id.* ¶ 64.  Two employees in English's sub-unit who were not laid off were older than English—one was 58 years old and the other 70.  *Id.*

English testified that, "in connection with the RIF," Mallick asked English, "Can you retire?"  English responded, "With a penalty."  *Id.*, Ex. H, at 26.  Mallick then told English that "people who [are] eligible to retire should retire and make room for the younger generation."  *Id.*

English also claims that the NYCTA sought to protect employees who had been newly hired in connection with the in-sourcing of the Unisys contract, rather than retaining older, experienced employees.  English Resp. ¶ 28.

English was laid off, effective September 17, 2010.  *Id.* ¶ 3.

## LEGAL STANDARDS

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The "mere existence of *some* alleged fact dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Id.* at 247-48.   When determining whether such a dispute exists, a court examines all evidence in the light most favorable to the nonmoving party.  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

The ADEA prohibits employers from discharging or discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment," on the basis of age.  29 U.S.C. § 623(a).  When analyzing claims of age discrimination, courts employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The plaintiff "bears the initial burden of establishing a *prima facie* case of discrimination."  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010).  If the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for its action."  *Id.* (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802).  Should the defendant provide such a reason, the plaintiff "can no longer rely on the *prima facie* case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination."  *Id.*  In the context of ADEA claims, a plaintiff "bringing a disparate-treatment claim . . . must prove, by a preponderance of the evidence, that

16

age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

The Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer" where "the merits turn on a dispute as to the employer's intent." *Gorzynski*, 596 F.3d at 101 (citation omitted).  Still, a plaintiff "must provide more than conclusory allegations" to withstand a motion for summary judgment.  *Id.*

## APPLICATION

### I.   *Prima Facie* **Case**

To demonstrate a *prima facie* case of age discrimination, Plaintiffs must show (1) that they were within the protected age group, that is, over 40 years old, (2) that they were qualified for their positions, (3) that they experienced adverse employment actions, and (4) that the actions occurred under circumstances giving rise to an inference of discrimination.  *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012).  It is undisputed that all Plaintiffs were over 40 years old, that they were qualified for their positions, and that they experienced adverse employment actions.

It is not at all clear that Plaintiffs have provided evidence that their terminations occurred under circumstances giving rise to an inference of discrimination.  A full analysis is unnecessary, however, because even assuming that Plaintiffs had established a *prima facie* case of age discrimination, Defendants have articulated a "legitimate, nondiscriminatory reason" for terminating Plaintiffs' employment.  *See Gorzynski*, 596 F.3d at 106 (citation omitted).

### II.   **Reduction in Force**

The RIF conducted by the NYCTA and MaBSTOA was a "legitimate, nondiscriminatory reason" for Plaintiffs' termination.  *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d

Cir. 2014). The Second Circuit "has long held that ADEA claims arising from the results of a firm's force reduction will generally not lie where the record demonstrate[s] that the reorganization was a business decision made on a rational basis." *Deebs v. ALSTOM Transp., Inc.*, 346 Fed. Appx. 654, 657 (2d Cir. 2009) (citation omitted).

The RIF was conducted on a rational basis by the NYCTA and MaBSTOA. It is undisputed that the NYCTA faced a severe budget deficit in 2008-2009. After instituting both a hiring freeze and a voluntary severance program, the NYCTA determined that non-voluntary layoffs were necessary. Def. Stmt. (English) ¶¶ 22-34. Employees were grouped according to their job titles within individual departments, and were evaluated by their supervisors. Supervisors received guidelines which contained specific categories on which employees were to be evaluated, using a pre-determined numerical scale. In addition, the guidelines defined each number on the scale for each category. When evaluating employees, the supervisors did not know how many employees—if any—would be terminated as a result of the RIF. *Id.* ¶ 48; Def. Stmt. (Kirkland) ¶ 94.

Plaintiffs attack the legitimacy of the RIF for a number of reasons. They argue that the NYCTA budgetary shortfall was not caused by declining real property sales and the economic recession of 2008 and 2009, as Defendants claim, *see* Def. Stmt. (English) ¶ 20, but rather by the NYCTA's mismanagement of its real estate portfolio, and its failure to properly monitor employees' overtime pay. English Resp. ¶ 20. There is no doubt, and Plaintiffs do not dispute, that NYCTA faced a massive budget shortfall. Even if that shortfall were due to the NYCTA's mismanagement, the deficit still had to be addressed. Even if Plaintiffs' assertions were true, this does not provide evidence that a RIF was unnecessary in 2010, or that Plaintiffs were laid off because of their ages.

Plaintiffs also contend that the implementation of the RIF process was deficient.  In particular, Plaintiffs argue that the "grouping" of employees for RIF purposes was unfair and nonsensical, and that certain Plaintiffs were ranked by supervisors who were unfamiliar with their day-to-day work, who did not properly review their previous annual reports.

Plaintiffs have produced evidence that implementation of the RIF process was imperfect.  For example, Librera testified during her deposition that, although she believed that the RIF process was fair and objective, "[w]hat she would like to have seen different was the outcome."  Def. Stmt. (Kirkland), Ex. X, at 63.  According to Librera, English and Gutierrez "were laid off even though they had very good evaluations . . . because they were considered among a small group of people and those were the provisional clericals in [S]ubways.  Had those groupings been done differently, the outcome would have been different."  *Id*.  Similarly, Hellman testified that Gutierrez, "who got very good . . . rankings[,] should not have gotten RIF'd."  *Id.*, Ex. W, at 48.  Instead, Hellman testified, the NYCTA "should have looked at everyone in total . . . everybody should have been part of the same pool and it should have been done Authority-wide. . . . I didn't think it was fair that clerical employees within Subways would get RIF'd."  *Id.*

But even if Plaintiffs and other NYCTA and MaBSTOA employees were dissatisfied with how employees were "grouped," that does not establish that the evaluations were discriminatory on the basis of age.  *See Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 599 (2d Cir. 2001) ("[A]s a general matter, the mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent.") (citation omitted).

Plaintiffs also claim that the RIF ranking guidelines inherently disfavored older employees.  But there is no evidence from which a reasonable jury could determine this to be the

case. For example, Gutierrez complains that the RIF evaluation did not include "any evaluation for the years of services that [she] ha[d] in Transit." Def. Stmt. (Kirkland) ¶ 168. Yet the RIF form used to evaluate Gutierrez included a category specifically directed to "Work-Related Experience," which "refer[red] to both TA/OA Experience and External Experience." *Id.*, Ex. I, J.

Similarly, English asserts that the TIS evaluation forms excluded categories such as Education, Work Experience, and Computer Skills. English Resp. ¶ 50. The first entry on the TIS evaluation guidelines, however, is "TA/OA Years of Service," with 0-3 years of service receiving the lowest possible score of "1," and 25+ years receiving the highest possible score of "5." English Decl., Ex. 30. The TIS guidelines also included categories designed to quantify employees' experience and skills, including "Job Knowledge," "Quality of Output," and "Supervisory Skills." *Id.*

Plaintiffs claim that the TIS and clerical/occupational RIF guidelines "assigned a low weight . . . to the number of years with the NYCT," while assigning high weights to "soft, subjective categories such as 'Initiative' and 'Communications Skills.'" English Resp. ¶ 50. Accordingly, Plaintiffs claim, the RIF evaluations undervalued older employees' years of service with the NYCTA and MaBSTOA, and permitted Defendants to manipulate the numbers in the "soft, subjective categories" to skew the evaluations in favor of their preferred employees.

It is undisputed that both the TIS and clerical/occupational guidelines expressly took into account employees' experience and years of service. The NYCTA also determined, based on the needs of its departments, what other categories to include, as well as the appropriate weights to assign to those categories. These guidelines were used to rank *all* RIF-eligible TIS and clerical/occupational employees, and there is no evidence that the results disproportionately

affected older employees.  Indeed, a number of employees younger than Plaintiffs were laid off, while many employees older than Plaintiffs retained their jobs.  *See Colon v. Trump Int'l Hotel & Tower*, 2011 U.S. Dist. LEXIS 140606, at *19 (S.D.N.Y. Dec. 6, 2011) ("Proof that a significant number of employees the same age or older than the plaintiff remained on the job undermines the claim that age was the determinative factor in the plaintiff's termination.") (citation omitted).  Simply because the guidelines did not assign the highest weight to categories related to "experience" does not render them discriminatory.

### III.    Plaintiffs' Discrimination Claims

Because Defendants have articulated a "legitimate, nondiscriminatory reason" for terminating Plaintiffs' employment, *see Gorzynski*, 596 F.3d at 106, Plaintiffs are not entitled to rely on a *prima facie* case.  Plaintiffs may defeat summary judgment, however, by setting forth evidence from which a reasonable jury could conclude, by a preponderance of the evidence, that "age was the 'but-for' cause of the challenged adverse employment action."  *See Gross*, 557 U.S. at 180.

Plaintiffs' claims of age discrimination are largely based on a handful of alleged and/or hearsay comments attributed to NYCTA executives.  "Verbal comments" are "evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004).  To determine whether a comment is a "probative statement that evidences an intent to discriminate" or whether it is "a non-probative 'stray remark,'" courts consider: "(1) who made the remark, *i.e.*, a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.*, whether a reasonable juror

could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decisionmaking process." *Id.*  As set forth below, the majority of the alleged comments were remote in time to the RIF evaluations, were not directed at Plaintiffs, and only marginally related to age.

Plaintiffs also claim that they were "replaced" by younger employees.  It is undisputed, however, that no new employees were hired to assume Plaintiffs' duties, but rather, Plaintiffs' responsibilities were assumed by other NYCTA and MaBSTOA employees.

### a.  Rosetta Kirkland

Kirkland's assertion that, according to Laura Turso, Librera, Cronin, and Bianco had discussed the need for "young blood" at a meeting, reflects merely a "stray remark."  Setting aside the hearsay problems posed by this statement, Librera's undisputed testimony is that, to the extent that such a statement was made, it had nothing to do with the RIF or with laying off employees, but instead with creating a social media-like internal communication platform for NYCTA and MaBSTOA employees.  Def. Stmt. (Kirkland) ¶ 137.

Moreover, Cronin, Bianco, and Librera did not evaluate Kirkland in connection with the RIF.  Kirkland was evaluated by Hellman, and received a RIF evaluation that she believed was "fair."  *Id.* ¶ 110.  Although Kirkland alleges that Librera was involved with her termination, Kirkland could not articulate whether, how, or why, Librera selected her for the layoffs.  Nor did the alleged meeting appear to affect other employees who were evaluated with Kirkland—Kirkland was 40 years old, and of the employees in her group who were not laid off, six were older than 40 (ages 60, 58, 55, 55, 45, and 41).  *Id.* ¶ 106.

Kirkland's claim that Turso, a younger employee, took over certain of Kirkland's responsibilities after her termination likewise does not provide evidence of age discrimination.

The fact that "other employees have assumed [her] work does not mean plaintiff was replaced," but "merely demonstrates that, as in most reduction-in-force cases, [the employer] has been successful in reducing the number of employees required to perform certain work." *McKinney v. NXP Semiconductors USA, Inc.*, 2009 U.S. Dist. LEXIS 86744, at *22 (S.D.N.Y. Mar. 2, 2009) (citation omitted).

### b.  Juana Gutierrez

Gutierrez's failure to receive a promotion in 2009 is not evidence of age discrimination, because it is undisputed that as of April 2008, the NYCTA had implemented a hiring and promotional freeze for all non-operating positions.[14]  Moreover, Gutierrez provides no information linking her stalled promotion to her age.

Gutierrez also claims that a handful of comments constitute evidence of age discrimination, but these comments—whether considered alone or as a whole—constitute mere stray remarks.  Prendergast's alleged comments that it was "amazing all the same faces [he] left behind" in the NYCTA, and that he was "surprised to see so many old faces" provide little evidence of discriminatory animus; if anything, the remarks seem to convey Prendergast's pleasure at recognizing familiar faces in the NYCTA and MaBSTOA.  Def. Stmt. (Kirkland) ¶¶ 151-52.  Nor were the comments made in the context of the RIF.  In fact, it is undisputed that Prendergast did not conduct any Plaintiff's RIF evaluation.

Karen Jeffries' alleged comment that the NYCTA wanted to "get rid of older employees. Deadwood," is also a stray remark.  *Id.*, Ex. V, at 63.  Jeffries was not Gutierrez's supervisor, nor

---

[14] Plaintiffs assert that Defendants hired and promoted employees during the hiring freeze, in violation of the NYCTA policy.  English Resp. ¶¶ 19, 25.  Plaintiffs' evidence, presented for the first time in Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, appears to have been compiled based on a search of the website LinkedIn.  This Court declines to consider this new evidence, which, in any event, is inadmissible hearsay.  *See* Fed. R. Evid. 801.

is there evidence that she conducted any RIF evaluations.  Moreover, the context of the remark is

unclear—Gutierrez's testimony indicates that Jeffries was simply sharing her own opinion

regarding the NYCTA's actions.

Hellman's alleged statement that Arthur Basley should "hire the young lady" from "the

temporary agency" also fails to provide evidence of discrimination. *Id.*, Ex. U, at 71.  There is no

evidence regarding what sort of position the "young lady" was being considered for, or whether

the position was even within the NYCTA or MaBSTOA.  Nor did Hellman evaluate Gutierrez in

connection with the RIF; he did evaluate Kirkland, who believed he had evaluated her "fairly."

*Id.* ¶ 110.  Moreover, none of the alleged comments appear to have resulted in older employees

in Gutierrez's group being disproportionately affected by the RIF.  Of the twelve who were laid

off in connection with the RIF, seven were younger than Gutierrez (ages 28, 30, 34, 37, 40, 40,

and 45); four employees who retained their jobs were older (ages 60, 58, 55, and 55).

### c.  Soossan Salmassi

Salmassi, Martinez, and Thigpen claim that during meetings in 2008 and 2009, Sidney

Gellineau discussed the need to get rid of "dead wood" in the MaBSTOA.  Def. Stmt. (Salmassi)

¶ 54.  These alleged comments constitute non-probative stray remarks.  Although Gellineau was

a Vice President of TIS, and therefore a high-level employee, it is undisputed that Gellineau did

not evaluate Salmassi, Martinez, Thigpen, or any other Plaintiff, in connection with the RIF.

Gellineau helped create the TIS evaluation guidelines, but there is no evidence that the

guidelines discriminated against older employees.  The remarks were made well before February

2010, when the RIF was announced, and they were not made "in relation to" the RIF process.

*See Schreiber*, 324 F. Supp. 2d at 519.  Gellineau's undisputed testimony is that the purpose of

his comments was to motivate managers to "writ[e] . . . people up for not doing their jobs." Def. Stmt. (Salmassi) Ex. M, at 34.

In any event, it is doubtful that the phrase "dead wood" is discriminatory, because it does not necessarily refer to age. Martinez, for example, testified that when Gellineau used the phrase "dead wood," Martinez "thought he was referring . . . not to old people, but to people who would be sleeping at work, people who would be reading only newspapers." Def. Stmt. (Martinez), Ex. D, at 60. This is consistent with Gellineau's own testimony, in which he stated that his comments regarding "get[ting] rid of the dead wood within TIS," referred to "employees that were sleeping," and "employees that weren't doing their jobs." Def. Stmt. (Salmassi), Ex. M, at 33-34; *see Wado v. Xerox Corp.*, 991 F. Supp. 174, 202 (W.D.N.Y. 1998) ("'Dead wood' implies employees who are unproductive or superfluous," and "could just as easily include younger employees as older employees").

Similarly, Gellineau and Castellaneta's complimenting Peter Giang for having "new ideas" and "embracing change" are also stray remarks. *See Altman v. New Rochelle Pub. Sch. Dist.*, 2014 U.S. Dist. LEXIS 84714, at *29 (S.D.N.Y. June 19, 2014) (holding that "remarks [plaintiff's supervisor] allegedly made encouraging [p]laintiff to learn from the young teachers who had fresh, new ideas" constituted stray remarks that did not, without more, give rise to an inference of discrimination).

Salmassi's other allegation that concerning age is that Christine Hoffman, a 30-year-old woman, took over Salmassi's responsibilities after her termination.[15] Salmassi does not dispute that, at the time of the RIF, Hoffman had already accepted a position in another TIS unit. Yet

---

[15] Salmassi has not demonstrated that her other allegations, namely, that Sugar assigned her a task relating to a contract that she was unfamiliar with, and that NYCTA refused to pay the annual fees for her auditor certification, relate in any way to her age.

even if Hoffman had assumed some of Salmassi's duties, it would not necessarily mean that she had "replaced" Salmassi.  *See McKinney*, 2009 U.S. Dist. LEXIS 86744, at *22.

### d.  Charles Thigpen

Thigpen claims to have overheard Gellineau make an additional comment relating to age: when Christine Hoffman joined Thigpen's unit, Gellineau said that she would bring "new life or new blood to the process."  Def. Stmt. (Thigpen), Ex. D, at 72.  Comments regarding "new life" or "new blood," however, do not "give rise to a reasonable inference of age discrimination" because they "could just as easily refer to bringing new members into a group, regardless of age, for a fresh perspective."  *Carter v. Verizon*, 2015 U.S. Dist. LEXIS 6370, at *1819 (S.D.N.Y. Jan. 20, 2015).

Thigpen also claims that he was discriminated against because in 2008, Sherry Sugar "threw away" his recommendation for a promotion.  The only connection Thigpen makes between his age and Sugar's alleged act is that another employee was also scheduled to receive a promotion, but did not receive one.  Def. Stmt. (Thigpen), Ex. D, at 67.  Without any additional information regarding the employee, such as his age and the circumstances surrounding his failure to receive the promotion, it would be impossible to conclude that Sugar's actions were motivated by age.  Indeed, Thigpen's testimony indicates that Sugar was motivated not by Thigpen's age, but by animosity towards Kateman.  *See id.*, Ex. D, at 67 (Sugar "threw away" Thigpen's recommendation from Kateman, and stated that Kateman "didn't do [her] any favors").

Thigpen objects to the fact that Castellaneta reviewed him for the RIF, because Castellaneta was "not [his] immediate manager."  Thigpen Resp. ¶ 44.  The "mere fact that [the NYCTA and MaBSTOA] failed to follow [their] own internal procedures" however, "does not

necessarily suggest that [they were] motivated by illegal discriminatory intent." *See Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 599 (2d Cir. 2001).  This is particularly true where each of the four employees ranked lower than Thigpen (age 60) were younger (ages 30, 35, 42, and 45), and four employees who were not terminated were his age or older (ages 63, 61, 60, and 60).

### e.  Oscar Martinez

Martinez's allegations are primarily based on the alleged comments by Gellineau in 2008 and 2009 regarding "dead wood."  Martinez also alleges that, while praising Peter Giang, Gellineau stated, "I want more people like this.  I want young blood."  Def. Stmt. (Martinez), Ex. D., at 92-93.  The phrase "young blood," when "made by decision makers in connection with [an employment] decision," may provide evidence of age discrimination.  *See Stampfel v. City of New York*, 2005 U.S. Dist. LEXIS 36371, at *15 (S.D.N.Y. Dec. 27, 2005).  Here, however, Gellineau did not evaluate Martinez—or any other Plaintiff—in connection with the RIF.  Nor is there evidence that the comment was directed at any particular employee.  *See Castro v. Local 1199, Nat'l Health & Human Servs. Emps. Union*, 964 F. Supp. 719, 726 (S.D.N.Y. 1997) ("[U]pper management's statement that the union needed 'young blood'" not considered discriminatory where they were made "in her presence" but "not expressly directed at plaintiff").  Indeed, at the time Gellineau allegedly made the comments, Martinez did not believe that Gellineau was referring to age.  *See* Def. Stmt. (Martinez), Ex. D., at 93 (when Gellineau referred to "young blood," Martinez believed that he meant "full of energy").  There is also no evidence that such statements had any effect on the RIF evaluations for Martinez's group: of the eight employees who were ranked lower than Martinez (age 49) in the RIF evaluations, all but

one were younger (ages 33, 37, 38, 42, 45, 47, and 48), and eleven employees who were not

terminated were older (ages 50, 51, 52, 55, 56, 59, 59, 60, 60, 61, and 63).  *Id.* ¶ 52.

The only other allegation Martinez sets forth is that he was required to train a younger

employee, Stanley Bryan, who eventually took over Martinez's job.  Yet Martinez claimed that

he trained Bryan in 2007, three years before Martinez was terminated.  In any event, the fact that

Bryan took over Martinez's job during a RIF does not provide evidence of age discrimination.

*See McKinney*, 2009 U.S. Dist. LEXIS 86744, at *22.

### f.   Deborah English

English's allegations that Mallick asked her whether she could retire, and told her that

"people who [are] eligible to retire should retire and make room for the younger generation,"

provides some evidence of age discrimination.[16]  Mallick was English's supervisor and evaluated

her during the RIF process, the remark was allegedly made in connection with the RIF, and a

reasonable juror might view the remark as discriminatory.  *See Schreiber*, 324 F. Supp. 2d at

519.

Viewed in conjunction with all of the evidence, however, that remark alone does not

provide sufficient evidence for a reasonable jury to be able to find that English would have not

have been terminated, but for her age.  The record reflects that both Mallick and Otero, who

assisted in preparing the ranking sheet, believed that English lacked the technological expertise

necessary for their unit.  Sixteen employees were reviewed in English's unit, six of whom were

---

[16] Though Mallick denies making this statement, for purposes of summary judgment, this Court views the facts in the light most favorable to Plaintiffs, the non-moving party.  *See Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

English also claims that Mallick addressed his female subordinates as "girls," and directed them to bring him coffee. Def. Stmt. (Salmassi) ¶ 55.  These allegations may be relevant to claims of sex discrimination, but English is asserting only an age discrimination claim.  While English asserts that "the 'girls' . . . [were] significantly younger than English," she provides no additional information to support this claim, or to connect it to her age discrimination claim.  Salmassi Resp. ¶ 51.

over the age of fifty, but English was the only one of the six who was laid off.  Two employees

who were not laid off were older than English: one was 70 and the other 58.  The only other

employee who was terminated was ten years younger than English.[17]  Def. Stmt. (English) ¶ 64.

## STATE LAW CLAIMS

Following the Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167

(2009), whether the same standard applies to NYSHRL claims as to ADEA claims is an "open

question within the Second Circuit."  *Digilov v. JPMorgan Chase Bank, N.A.*, 2015 U.S. Dist.

LEXIS 19370, at *31 (S.D.N.Y. Feb. 18, 2015).  In addition, the standard for age discrimination

claims under NYCHRL is more permissive than that of the ADEA.  *Velazco v. Columbus*

*Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015).  This Court therefore declines to exercise

jurisdiction over Plaintiffs' NYSHRL and NYCHRL claims.  *See* 28 U.S.C. § 1367(c).

---

[17] English also asserts that the new employees who had been hired in connection with the Unisys in-sourcing were retained during the RIF, while older, more experienced employees were terminated.  She admits, however, that the employees who she claims should have been terminated received high scores in their RIF evaluations.  Salmassi Decl. ¶ 101; Salmassi Resp. ¶ 32.

## <u>CONCLUSION</u>

Defendants' Motions for Summary Judgment are GRANTED with respect to Plaintiffs'

ADEA claims.  The Clerk of Court is directed to enter judgment and close these cases.


Dated: New York, New York                    SO ORDERED
       September 3, 2015

                                                  _____

                                                  PAUL A. CROTTY
                                                  United States District Judge